THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF SANDOVAL
STATE OF NEW MEXICO

CASSANDRA C DE BACA, as Personal Representative
of the ESTATE OF BEN C DE BACA, deceased.

**Plaintiff,**

Case No. D-1329-CV-2017-01900

vs.

TOWN OF BERNALILLO, ex. rel
TOWN OF BERNALILLO POLICE DEPARTMENT;
OFFICER JEREMIAH BENJEY, sued in his individual capacity;
OFFICER SHAWN VIGIL, sued in his individual capacity;
COUNTY OF SANDOVAL, ex. rel
SANDOVAL COUNTY SHERIFF'S DEPARTMENT;
OFFICER PATRICK SEGURA, sued in his individual capacity;
SERGEANT JAMES LAPORTE, sued in his individual capacity;
OFFICER JOHN DOE, 1-10, sued in their individual capacities.

**Defendants.**

## COMPLAINT FOR WRONGFUL DEATH

COMES NOW, Plaintiff Cassandra C de Baca, as Personal Representative for the Wrongful Death

Estate of BEN C DE BACA, by and through Counsel of record, Ahmad Assed & Associates

(Ahmad Assed, Esq. & Richard J. Moran, Esq.), and hereby brings this *Complaint for Wrongful*

*Death* against the above-named defendants.

## PARTIES, JURISDICTION AND VENUE

1. At the time he was a victim of homicide, on September 6, 2015, Ben C de Baca was a resident
   of Santa Fe County, New Mexico.

2. Plaintiff Cassandra Baca (herein "Plaintiff"), is a resident of Santa Fe County, New Mexico.



3. On July 15, 2016, Plaintiff was appointed by New Mexico's First Judicial District Court as personal representative of Mr. Ben C de Baca's Estate for purposes of bringing wrongful death claims in D-101-CV-2016-01616.

4. Defendant Town of Bernalillo is a municipality in the State of New Mexico which at all times material hereto, was the employer of Defendants Vigil and Benjey. The County is a local public body pursuant to the New Mexico Tort Claims Act. NMSA 1978, § 41-4-3 (2009).

5. Defendant Sandoval County is a county in the State of New Mexico, which at all times material hereto, allowed Defendant Segura to act on its behalf via a cross-commission, benefiting from his service. In this respect, Defendant Segura was a "public employee" as defined by the New Mexico Tort Claims Act and *Loya v. Gutierrez*, 2015 -NMSC- 017.

6. At the time of this incident, Defendant Jeremiah Benjey was employed by Defendant Town of Bernalillo serving in the capacity of a law enforcement officer. At all times relevant to this complaint, he was acting in the course and scope of his employment. He is sued in his individual capacity.

7. At the time of this incident, Defendant Shawn Vigil was employed by Defendant Town of Bernalillo serving in the capacity of a law enforcement officer. At all times relevant to this complaint, he was acting in the course and scope of his employment. He is sued in his individual capacity.

8. At the time of this incident, Defendant Patrick Segura was a law enforcement officer working for the Santa Ana Pueblo Police Department. Moreover, as a tribal police officer he had been commissioned as a deputy county sheriff for Sandoval County Sheriff's Office, and was a person acting on behalf of the government or in service of governmental entity in official

capacity on September 6, 2015. He was a "public employee" for whom a governmental entity could be required to provide a defense from certain actions.

9. At the time of this incident, Defendant James Laporte was employed by the City of Rio Rancho serving in the capacity of a law enforcement officer. At all times relevant to this complaint, he was acting in the course and scope of his employment. He is sued in his individual capacity.

10. At the time of this incident, Officer John Doe, 1-10, were employed by either Sandoval County or the Town of Bernalillo in the capacity of law enforcement officers. At all times relevant to this complaint, they were acting in the course and scope of their employment. At this time, it remains unclear as to the identity of certain law enforcement officers who were present on the scene, as the provided lapel footage does not show the names of those officers. Should they be named, it would be in their individual capacity.

## FACTS COMMON TO ALL CLAIMS

11. During the late afternoon of September 6, 2015, Mr. Ben C de Baca was involved in a car accident at the McDonalds in Sandoval County. According to witnesses, he had an altercation with his spouse who was driving the vehicle. The vehicle accelerated around a corner and collided with the rear of a parked vehicle.

12. Following the accident, Mr. C de Baca exited the vehicle and headed towards a nearby Wal-Mart. According to 911 emergency calls, Mr. C de Baca ran through the Wal-Mart parking lot, in distress, injured, and asking for customers to call for help.

13. According to witnesses, Mr. C de Baca entered Wal-Mart and appeared to be intoxicated and agitated. He frantically walked toward the electronics section and overturned two television displays. He then walked to the cash register portion of the store and threw soda at a customer.

Throughout these events, he was screaming for help and ranting in a manner that lead numerous witnesses to conclude that he was under the influence of a narcotic.

14. Two customers were able to subdue Mr. C de Baca, by grabbing him, taking him to the floor, and sitting on him until police arrived. According to witnesses, several minutes elapsed before police responded, but the customers were able to calm Mr. C de Baca down.

15. The first law enforcement officer to arrive on scene was Defendant Jeremiah Benjey. According to witnesses, Defendant Benjey attempted to handcuff Mr. C de Baca, but was unable to as Mr. C de Baca clenched onto the leg of the customer, who had calmed him down.

16. For reasons unknown, Defendant Benjey conveyed to dispatch that he was in a "fight" with Mr. C de Baca. In reality, Mr. C de Baca was actively resisting being handcuffed, but there is no indication that he used a closed fist, or any weapon, on Defendant Benjey.

17. Defendant Shawn Vigil arrived next, and both he and Defendant Benjey actively struggled with Mr. C de Baca. While physically restraining Mr. C de Baca, Defendant Vigil was bitten on the inside of his left leg.

18. During this struggle, a witness heard one of the two officers threaten to use a Taser on Mr. C de Baca if he did not comply. Mr. C de Baca pleaded with these officers to not use a Taser, as he would have a heart attack.

19. Dispatch sent word to other law enforcement units that Mr. C de Baca had engaged in a fight with Defendant Benjey, and units from the Sandoval County Sheriff's Office, the Santa Ana Pueblo Police Department, and Rio Rancho Police Department swarmed the scene.

20. Defendants Benjey and Vigil successfully handcuffed Mr. C de Baca, who continued to plead for help while lying face down in the front entrance of the Wal-Mart. Both Defendants continued to apply pressure on Mr. C de Baca's back by placing their knees on him.

4

21. Defendants Benjey and Vigil were joined by Defendant Patrick Segura, of the Santa Ana Pueblo Police Department, who was acting in his role as a cross-commissioned law enforcement officer with the Sandoval County Sheriff's Department.

22. Also present was Defendant Sergeant James LaPorte, with the Rio Rancho Police Department.

23. Defendant LaPorte recalls seeing the three Defendants (Virgil, Benjey, and Segura) sitting on top of Mr. C de Baca.

24. Defendants Benjey, Vigil, and Segura were able to fully restrain the hand-cuffed Mr. C de Baca, who continued to plead for help and expressed to them that he was in pain.

25. When Defendant Benjey, Vigil, and Segura attempted to lift Mr. C de Baca, his legs gave out from him and he was unable to walk. In turn, the three Defendants proceeded to drag Mr. C de Baca from the front entrance of the Wal-Mart to near Defendant Benjey's police vehicle.

26. According to Defendant LaPorte, Mr. C de Baca was dragged to Defendant Benjey's motor vehicle, with his face inches away from the vehicle's exhaust pipe. The motor vehicle was running at that point.

27. During the entirety of the encounter, up until his death, Mr. C de Baca remained on his stomach with the weight of several law enforcement officers on his back and legs.

28. Based on dash camera video of the incident, it took the Defendants approximately 10 seconds to drag Mr. C de Baca from the Wal-Mart entrance to the rear of Defendant Benjey's vehicle.

29. Within five seconds of placing Mr. C de Baca down on the ground, the three Defendants (Benjey, Vigil, and Segura), as well as other unknown officers, immediate began to place the whole of their weight on various parts of Mr. C de Baca's body.

30. Initially, Defendants Benjey and Vigil held Mr. C de Baca's legs, as they dragged him from the Wal-Mart front entrance. When they arrived at Defendant Benjey's car, Defendant Vigil

ordered Defendant Benjey to get a spit sock. Defendant Vigil then placed his weight on Mr. C de Baca's legs.

31. Upon information and belief, Defendant Segura placed his knees onto Mr. C de Baca's left shoulder blade area.

32. An unidentified Town of Bernalillo Police Department officer placed his knee in Mr. C de Baca's right shoulder blade area.

33. It took Defendant Benjey over one minute to retrieve the spit sock, and during this time the dash cam vide shows that Mr. C de Baca, with the weight of three grown men on him, is simply pleading for help and otherwise docile.

34. Despite this, Defendant Benjey unnecessarily and without reason placed the spit sock on Mr. C de Baca.

35. A spit sock is composed of a mesh portion and a thicker fabric that when placed on a person would not cause suffocation or impair breathing:



36. Defendant Town of Bernalillo purchased the spit sock, under the trade name Tranzport Hood, used by Defendant Benjey from a company called Safariland. Included in every spit sock package is a set of instructions.

37. The instructions set out from the onset: "Warning: IMPROPER USE OF THE TRANZPORT HOOD MAY CAUSE INJURY OR DEATH."

38. The instructions describe how the improper use of the Tranzport Hood "may result in serious injury or death due to asphyxiation, suffocation, or drowning in ones[sic] own fluids."

39. The instructions want that the Tranzport Hood should not be used "on anyone that is vomiting, having difficulty breathing, or is bleeding from the mouth or nose."

40. The instructions dictate how to place the Tranzport Hood on persons, providing a step-by-step procedure and photo of how it should appear after proper placement.

41. Despite these instructions, lapel video recovered from the incident indicates that Defendant Benjey, deliberately and indifferently, placed the spit sock on Mr. C de Baca such that the entirety of the spit sock covered his entire head:



42. Once the spit sock was improperly placed on Mr. C de Baca, the Defendants all collectively continued to place their knees upon Mr. C de Baca's back, with some raising his arms and continuing to twist his wrists and thumbs.

43. Several times, Mr. C de Baca's wrists were manipulated and twisted, despite being hand cuffed and restrained, with the obvious intent of causing pain and discomfort.

7

44. In obvious pain, Mr. C de Baca pleaded to the officers on numerous times to let him free, as he could not breathe. On at least two occasions, he told the Defendants that was dying.

45. At no point did the Defendants take Mr. C de Baca's cries for help seriously, simply admonishing him to "calm down."

46. For approximately four (4) minutes, from the point when the spit sock was placed on Mr. C de Baca, the Defendants continued to apply weight to Mr. C de Baca's left and right shoulders, his legs, and his wrists and arms.

47. During this four (4) minutes, Mr. C de Baca continues to plead for his life, screaming in agony, telling the officers he cannot breathe, that he is dying.

48. As evidence from the lapel video, Mr. C de Baca's cries and pleas slowly quiet to whimpers. Ultimately, he falls silent and is completely limp.

49. The Defendants continue to apply their weight onto him, continue to hold his arms, and make no efforts to determine or investigate why he has fallen silent. Instead they sit upon him until Defendant Segura lifts Mr. C de Baca's lifeless arm and determines something is wrong.

50. Sergeant LaPorte later informed investigators that he had never seen a spit sock placed on a suspect in the manner in which the Defendants put it on Mr. C de Baca.

51. Sergeant LaPorte advised that he never saw Mr. C de Baca spit, such that a spit sock was necessary.

52. Sergeant LaPorte advised that given the position the Defendants had placed Mr. C de Baca, he would not have been able to bite the officers.

53. Finally, Sergeant LaPorte advised the Defendants that they should turn Mr. C de Baca from his stomach to his side, and he based this on his medical knowledge. The Defendants ignored Sergeant LaPorte.

54. After efforts to revive Mr. C de Baca were unsuccessful, the scene of his death was taped off, and the Office of the Medical Examiner was called to the scene. Additionally, Mr. C de Baca's family was notified. The media arrived on the scene as well.

55. Mr. C de Baca's family was provided vague answers to their questions, namely that Mr. C de Baca suffered a medical episode during the arrest. At no time did Bernalillo Police Department officials mention that the Defendants placed a spit sock, while keeping Mr. C de Baca on his stomach, while apply pressure to his back, legs, and wrists.

56. Similarly, Bernalillo Police Chief Tom Romero told the media, "After the man was handcuffed, while on the ground outside of Walmart entrance, he suddenly died."

57. According to Chief Romero, "no shots were fired, no tazers were utilized, no pepper spray was utilized, nothing like that…the man was never placed in any choke hold-like position."

58. According to these media reports, Chief Romero suspected that the man died of a medical episode following the hectic string of events.

59. The on-scene OMI investigation involved asking each of the Defendants what had occurred, as well as inspecting Mr. C de Baca's body, and the items near his body. The initial OMI investigation concluded that "no signs of trauma were observed that would be considered to support the conclusion of 'excessive force' or positional asphyxiation at this time." What is omitted from the initial OMI investigation is any reference to the use of the spit sock and or the unreasonable manner in which the Defendants restrained Mr. C de Baca in the final moments of his life.

60. It was not until January, 2016 that Mr. C de Baca's family learned for the first time the circumstances of Mr. C de Baca's unnecessary and preventable death.

61. On January 14, 2016, the OMI released its final Report of Findings, reaching a far different conclusion it had previously made in September, 2015.

62. As to the cause of death, the OMI found that Mr. C de Baca died of "excited delirium (cocaine intoxication) complicated by means of physical restraint."

63. As to the manner of death, the OMI concluded that Mr. C de Baca was a victim of homicide.

64. A contributing factor, according to the OMI, was cardiovascular disease, a condition Mr. C de Baca was aware of and made the Defendants aware of while detaining him.

65. The OMI's report found:

> A complex combination of factors ultimately led to Mr. C De Baca's death. Cocaine intoxication manifested as an excited delirium and disruptive behavior that brought him into contact with law enforcement. In efforts to control and restrain Mr. C De Baca, he was held by multiple means of physical restraint.

> During and in a short period of time following stressful situations, such as struggling against physical restraints, stress hormones are released by the body. As part of the body's natural "fight or flight" response, these stress hormones act in a similar manner to stimulants, increasing the body's blood pressure and heart rate. As blood pressure and heart rate increase, the heart and body demand more oxygen to function properly. Without adequate oxygen supply to the heart, a heart attack or fatal arrhythmia (abnormal heart beats) may occur. A combination of the stressful situation, cocaine use, and his underlying heart disease, all would have greatly increased both his heart and body's demand for oxygen.

66. The OMI report further attributed the actions of the Defendants as a significant, casual factor in Mr. C de Baca's death:

> Additionally, Mr. C De Baca was placed prone with officers holding him down to restrain him, which can limit chest expansion and impair breathing. A spit shield was placed over his face, and was observed to cover his nose and mouth during the struggle. If improperly placed, spit shields also have the potential to impair breathing by suffocation.

> Although Mr. C De Baca's delirium was ultimately cocaine induced, his struggle against physical restraint would have heightened the effects of his body's internal hormonal and chemical derangement. Also, the possibility of asphyxia (lack of oxygen) secondary to the use of a spit shield cannot be ruled out. Therefore, the manner of death is best classified as homicide.

67. Mr. C de Baca's death was unnecessary and unreasonable. The Defendants were deliberately indifferent to his medical needs, instead using excessive force in restraining Mr. C de Baca which caused his death.

## COUNT I: WRONGFUL DEATH OF MR. C DE BACA UNDER THE NEW MEXICO TORT CLAIMS ACT
### (DEFENDANTS BENJEY, VIGIL, AND SEGURA)

68. The Plaintiff re-alleges the above as if pleaded fully herein.

69. At all times pertinent hereto Defendants Benjey, Vigil, and Segura were "law enforcement officers" for whom immunity is waived for under NMSA § 41-4-12 for their actions which predicated and are the cause of Mr. C de Baca's death.

70. Defendants knew that Mr. C de Baca was suffering from a medical or psychological episode by his actions in the Wal-mart, as well as the tone and content of his communications with him.

71. Defendants knew that Mr. C de Baca was either suffering injuries from the car accident or was under the influence of a narcotic when they first encountered him.

72. Defendants knew that Mr. C de Baca was concerned that he susceptible to suffering a heart attack, as he told them as much when they threatened to use a Taser on him.

73. Defendants ignored these initial impressions, and instead used a disproportionate and excessive amount of force to restrain Mr. C de Baca. Specifically, the Defendants:

    a. Hand-cuffed Mr. C de Baca and placed him on his stomach;

    b. Placed their individual and collective weight upon his back and shoulder blades;

    c. Twisted and manipulated his wrists and hyperextended his arms; and

    d. By placing a spit sock over his entire face, such that he could not breathe.

74. Defendants ignored Mr. C de Baca's pleas for help and his cries that he could not breathe.

75. When Mr. C de Baca alerted the Defendants that he was dying, they did nothing but continue applying pressure to his back and leaving the spit sock on his head.

76. Even after Mr. C de Baca had died, showing no signs of life, the Defendants continued to sit on top of him.

77. Had the Defendants not placed Mr. C de Baca on his stomach, not twisted and manipulated his wrists and arms to make breathing difficult, and not placed a spit sock over the entirety of his head, Mr. C de Baca would not have died.

78. At the time the Defendants placed the spit sock on Mr. C de Baca, he was not spitting. Indeed, there is no indication that Mr. C de Baca spit at anyone at any time.

79. The spit sock used by Defendants is not intended to prevent a person from biting another. It is solely designed to prevent the transmission of bodily fluids through spitting.

80. The Defendants placed the spit sock on Mr. C de Baca because he had previously bitten Defendant Vigil, not because he was going to spit on the any of the nearby officers.

81. Immediately prior to placing the spit sock on Mr. C de Baca, there was no threat that he would bite any person nearby, as he was fully restrained and incapable of such behavior.

82. There is no justification for the actions of Defendants in placing Mr. C de Baca in a position where he would asphyxiate or suffer any sort of trauma or harm.

83. Each of the Defendants are certified law enforcement, such that they have been trained and annually receive training by the New Mexico Law Enforcement Academy.

84. Part of this training concerns the proper use of force law enforcement is to deploy.

85. Part of this training concerns presenting the current state of the law, namely Constitutional and civil law, such that participants can identify the Constitutional protections and relevant laws that apply to law enforcement proper use of force.

86. Lecturers provide participants with handouts, some of which are titled "Excited Delirium, Restraint Asphyxia, Positional Asphyxia, and 'In-Custody' Syndromes…," "Frequency of sign

of excited delirium syndrome in subjects undergoing police use of force: descriptive evaluation of a prospective, consecutive cohort," and "Law Enforcement Responses to Excited Delirium."

87. Defendants individually received this training as part of their annual certification process, and certainly as part of their initial training while in the New Mexico Law Enforcement Academy.

88. Despite this training, Defendants deliberately ignored the concepts and principles they were taught regarding excited delirium and positional asphyxia.

89. Their deliberate and intentional actions have a causal and proximate connection to Mr. C de Baca's death.

90. As a result of their actions, Defendants harmed Mr. C de Baca, and his estate is entitled to damages.

## COUNT II: NEGLIGENT TRAINING AND SUPERVISION UNDER THE NEW MEXICO TORT CLAIMS ACT
### (DEFENDANTS TOWN OF BERNALILLO AND SANDOVAL COUNTY)

91. The Plaintiff re-alleges the above as if pleaded fully herein.

92. Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, were at the time of this incident, and continue to be, the supervisory arm of its law enforcement officers acting within the scope of law enforcement duties. Further, Mr. C de Baca's injuries arose out of a tort enumerated the New Mexico Tort Claims Act. As such, any immunity granted by the Tort Claims Act has been waived pursuant to NMSA 1978, § 41-4-12.

93. Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, employed or continue to employ Defendants Benjey and Vigil.

94. Sandoval County, ex. rel. Sandoval County Sheriff's Department, employed or continue to employ, via a cross-commission, Defendant Segura.

95. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, have a duty to train and supervise their subordinates regarding the proper manner in which to effectuate arrests.

96. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, have a duty to train and supervise their subordinates as to how to recognize and provide assistance to citizens who exhibit signs of any mental illness or narcotic episode.

97. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, have a duty to train and supervise their subordinates as to the dangers of positional asphyxia and excited delirium.

98. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, have a duty to train and supervise their subordinates as to not using excessive force in making arrests.

99. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, purchased the spit sock used during Mr. C de Baca's arrest, purchasing it from Safariland under the trade name Tranzport Hood.

100. Upon information and belief, Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, has a duty to train and supervise its subordinates in the proper use of the Tranzport Hood.

101. Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department and Sandoval County, ex. rel. Sandoval County Sheriff's Department, breached their duties to train and supervise Defendants Benjey, Vigil, and Segura by allowing them to:

   a. Effectuate an arrest that kept Mr. C de Baca on his stomach for over 5 minutes;

   b. Effectuate an arrest the saw the Officer-Defendants place the weight of their collective bodies upon his back, limiting his breathing;

   c. Effectuate an arrest that involved the application of the spit sock over the entirety of Mr. C de Baca's head;

   d. Effectuate an arrest that blatantly ignored the pleas for help and medical assistance by Mr. C de Baca;

   e. Failing to provide access to resources for persons who appear to be suffering from a mental illness or episode.

102. Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department's various breaches of these duties are a proximate cause of the death of Mr. C de Baca.

103. As a result of Defendants Town of Bernalillo, ex. rel. Town of Bernalillo Police Department, and Sandoval County, ex. rel. Sandoval County Sheriff's Department, negligent training and supervision of its subordinates, Mr. C de Baca was harmed and is entitled to damages.

## COUNT III: EXCESSIVE FORCE RESULTING IN DEATH IN CONTRAVENTION OF THE FOURTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION (TITLE 42 U.S.C. 1983 (DEFENDANTS BENJEY, VIGIL, AND SEGURA)

104.    The Plaintiff re-alleges the above as if pleaded fully herein.

105.    Any and all actions or omission committed by Defendants Benjey, Vigil, and Segura were acts and omissions which occurred within the course and scope of their capacity as law enforcement officer employed by Defendants Town of Bernalillo and County of Sandoval. Further, these Defendants Benjey, Vigil, and Segura acted under the color and pretense of the laws of the State of New Mexico.

106.    Defendants Benjey, Vigil, and Segura owed duties as agents/employees of Defendant Town of Bernalillo and County of Sandoval to serve and protect the public, including Mr. C de Baca.

107.    On September 6, 2015, these Defendants had a duty to not use excessive or deadly force during their interactions with Mr. C de Baca.

108.    The Defendants violated a clearly established law about which a reasonable person would know. Namely, the contours of this law have been sufficiently announced in numerous judicial opinions such as *Cruz v. City of Laramie*, 239 F.3d 1183, 1188–89 (10th Cir.2001) and *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008). Specifically, it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir.2004). *See also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061–62 (9th Cir.2003); *Gutierrez*, 139 F.3d at 450–51.

16

109. The Defendants' conduct, in placing a spit sock over the entire head of Mr. C de Baca, while on his stomach in the prone position and bearing the weight of three grown men, was unreasonably excessive.

110. The Defendants' conduct in the manner in which they seized Mr. C de Baca and deprived him of his life were objectively unreasonable.

111. Each of the Defendants have been trained in the dangers of positional asphyxiation, excited delirium, and the legal and Constitutional concepts associated with using excessive force. In fact, such curriculum is a standard component of each Defendant's annual training.

112. The Defendants acted jointly and with the mutual understanding in restraining Mr. C de Baca. By acting in concert to seize Mr. C de Baca, Defendants both personally contributed and conspired to commit unlawful acts by the use of excessive force inflicting injury and death upon Mr. C de Baca.

113. The Defendants, acting in the course and scope of their employment, and under the color of state law, acted with deliberate and unreasonable conduct in the manner in which they seized Mr. C de Baca, thus creating a dangerous and known risk of physical trauma resulting in his death and in violation of clearly established law, which any reasonable law enforcement officer would have known.

114. The Defendants' actions, as stated throughout, caused Mr. C de Baca to be deprived of his rights under both the Fourth and Fourteenth Amendments to the United States Constitution, rights that he enjoyed prior his homicide and rights that the Defendants were obligated to protect.

115. Despite his pleas for help and assertions that he was dying, despite his previous warnings regarding the potential for a heart attack, despite the obvious signs of intoxication, despite the

obvious signs of his medical need, despite the prolonged and unreasonable amount of time the Defendants applied pressure to his back while on his stomach, and despite the obvious difficulties Mr. C de Baca had in breathing because of the placement of the spit sock, the Defendants were deliberately indifferent to his state, his needs, and his well-being.

116. As a direct and proximate result of Defendants' actions, Mr. C de Baca was injured and harmed, entitling Plaintiff to receive damages.

117. As a direct and proximate result of their acts and omissions, Defendants are liable in damages to Plaintiff's estate for the deprivations of Mr. C de Baca's rights under 42 U.S.C. 1983.

## COUNT IV: FAILURE TO INTERCEDE TO PREVENT VIOLATIONS OF MR. C DE BACA'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS (TITLE 42 U.S.C. 1983) (DEFENDANTS LAPORTE AND JOHN DOES 1-10)

118. The Plaintiff re-alleges the above as if pleaded fully herein.

119. On September 6, 2015, Defendant Laporte made contact with Defendants Benjey and Vigil inside the main entrance of the Walmart.

120. On September 11, 2015, Defendant Laporte made statements regarding his involvement and recollection of the events leading up to Mr. C de Baca's death.

121. He stated that he recalled seeing Mr. C de Baca on the floor of the Wal-mart, on his stomach, being detained by Defendants Benjey, Vigil, and Segura.

122. He recalled the Defendants attempting to lift and move Mr. C de Baca to the outside portion of Wal-mart, to which he told Mr. C de Baca, "if you're not going to walk out of here we're going to drag you out."

123. He recalled asking Mr. C de Baca several questions while the Defendants were placing pressure on his back and while Defendant Benjey placed a spit sock on the entirety of his head.

124. He recalled making a comment to the Defendants that they need to roll Mr. C de Baca onto his side. He knew this should be done based on his medical knowledge.

125. He recalled walking away from the Defendants to the nearby McDonalds to check the status of that investigation.

126. He recalled seeing the Defendants place a spit sock on Mr. C de Baca in a manner in which it was not normally used.

127. He recalled seeing Mr. C de Baca in a position where he would have been unable to bite any of the officers who sat upon his back.

128. Defendant Laporte knew that leaving Mr. C de Baca on his stomach, while the pressure of three grown men was applied to his back, could cause harm and was unreasonably excessive.

129. Defendant Laporte knew that leaving Mr. C de Baca on his stomach, while a spit sock was wrongfully placed over the entire head of Mr. C de Baca, could cause harm and was unreasonably excessive.

130. Defendant Laporte, acting under the color of law, had a realistic opportunity to prevent the deprivation of Mr. C de Baca's Fourth and Fourteenth Amendment rights. Instead of intervening, he chose to attend to a crash site at the nearby McDonalds.

131. Defendant Laporte had sufficient time to intervene as the Defendants' excessive and unreasonable conduct spanned nearly 5 minutes. Moreover, Defendant Laporte was capable of preventing or stopping the harm but chose not to stop any of the Defendants, particularly Defendant Benjey, as they placed the spit sock over Mr. C de Baca's entire head.

132. The Defendants Laporte's failure to intercede, as stated throughout, caused Mr. C de Baca to be deprived of his rights under both the Fourth and Fourteenth Amendments to the United

States Constitution. His actions were in contravention of clearly established law, namely the law as stated in *Weigel v. Broad*, 544 F.3d 1143, 1153 n. 4 (10th Cir.2008).

133.    As a direct and proximate result of Defendant Laporte's failure to intercede, Mr. C de Baca wrongfully died. Therefore, Defendant Laporte is liable in damages to Plaintiff's estate for the deprivations of Mr. C de Baca's rights under 42 U.S.C. 1983.

## RELIEF REQUESTED

In her capacity, Plaintiff is entitled to collect on behalf of the beneficiaries of the estate for appropriate distribution as personal representative. Plaintiff respectfully requests that the Court enter judgment in his favor as follows:

1. Awarding damages against all Defendants in an amount that the jury determines is sufficient to compensate Mr. C de Baca's estate for the claims identified above;

2. Awarding damages against all Defendants in an amount the jury determines sufficient to compensate Mr. C de Baca's for the Defendants' tortious conduct;

3. Awarding punitive damages against the individual Defendants in an amount the jury determines is sufficient to deter the Defendants, and other law enforcement officers, from acting in a reckless and callous disregard to the rights of New Mexico residents;

4. Awarding reasonable costs and attorneys' fees incurred in bringing this action and pursuant to 42 U.S.C. § 1988; and

5. Any other relief the Court deems just and proper.

Respectfully Submitted,

*/s/Ahmad Assed*
Ahmad Assed
Richard J. Moran
Ahmad Assed and Associates
818 5th Street NW

THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF SANDOVAL
STATE OF NEW MEXICO

CASSANDRA C DE BACA, as Personal Representative
of the ESTATE OF BEN C DE BACA, deceased.

                    Plaintiff,

vs.                                        Case No.  D-1329-CV-2017-01900

TOWN OF BERNALILLO, ex. rel
TOWN OF BERNALILLO POLICE DEPARTMENT;
OFFICER JEREMIAH BENJEY, sued in his individual capacity;
OFFICER SHAWN VIGIL, sued in his individual capacity;
COUNTY OF SANDOVAL, ex. rel
SANDOVAL COUNTY SHERIFF'S DEPARTMENT;
OFFICER PATRICK SEGURA, sued in his individual capacity;
SERGEANT JAMES LAPORTE, sued in his individual capacity;
OFFICER JOHN DOE, 1-10, sued in their individual capacities.

                    Defendants.


## JURY DEMAND

COMES NOW the Plaintiff, CASSANDRA C DE BACA, by and through counsel, Ahmad

Assed & Associates (Ahmad Assed, Esq. and Richard J. Moran, Esq.), and hereby demands a jury

of six (6) persons.


                              Respectfully Submitted,

                              /s/Ahmad Assed
                              Ahmad Assed & Associates
                              Ahmad Assed, Esq.
                              Richard J. Moran, Esq.
                              818 Fifth Street NW
                              Albuquerque, NM  87102
                              Tel: 505.246.8373
                              Fax: 505.246.2930